**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

UNITED STATES OF AMERICA    )
                               )
     v.                 )      1:18CR301-1
                               )
JAI MONTREAL WINCHESTER    )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on the defendant's untitled filing (Docket Entry 45 ("Immediate Release Motion")), which "moves this Court pursuant to 18 U.S.C. § 3143 and Federal Rules of Criminal Procedure 32.1 and 46 for [his] immediate release in light of the increasingly dire COVID-19 coronavirus pandemic" (id. at 1). (See Docket Entry dated Mar. 23, 2020 (referring Immediate Release Motion to undersigned United States Magistrate Judge).) For the reasons that follow, the Court denies the Immediate Release Motion.

INTRODUCTION

This case originally commenced with the return of an Indictment charging the defendant with possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). (Docket Entry 1.) After his arrest, the Court (per United States Magistrate Judge Joi E. Peake) released the defendant on conditions (see Docket Entry 9), including that he "not violate federal, state, or local law while on release" (id. at 1) and that he "not use or unlawfully possess a narcotic drug or other controlled substance" (id. at 2). The defendant thereafter pleaded guilty and

the Court (per Chief United States District Judge Thomas D. Schroeder) allowed the defendant "to remain on bond under present terms and conditions of release." (Docket Entry dated Nov. 6, 2018; see also Docket Entry 13 (Plea Agt.).)

The Probation Office then prepared a Presentence Report (Docket Entry 15 (the "PSR")), which documented, inter alia, that:

1) on December 4, 2016, officers responded to a 911 call regarding a shooting in Kannapolis, North Carolina, and found C.T.R. "dead in front of his house with an apparent gunshot to his head" (id. at 3; see also id. ("On [C.T.R.'s] body was a semi-automatic gun on a sling over his shoulder."));

2) "[t]he [911] caller advised officers that a beige station wagon had approached [C.T.R.'s] residence, and soon thereafter three gunshots were heard . . . [whereupon the station wagon] fled the area" (id. at 4);

3) "[s]oon after the discovery of [C.T.R.'s] dead body, a vehicle matching the description provided by the 911 caller was stopped on Interstate 85" (id.);

4) "[t]he vehicle was occupied by [J.R.] and [the defendant]" (id.; see also id. ("[J.R.] was the driver and [the defendant] was the front seat passenger."));

5) "[a consent-based] search of the vehicle led to the discovery of a revolver under the driver's seat . . . contain[ing] three empty shell casings" (id.);

6) "[d]uring [a further warrant-based] search of the vehicle, officers located a black case with drug paraphernalia on the front passenger floorboard . . . and a .380 caliber handgun in the locked glove box" (id. (emphasis omitted); see also id. ("The serial number for this firearm had been removed. The firearm was loaded with a single round of .380 ammunition."));

7) after waiving his *Miranda* rights, the defendant told officers "he had sold Xanax pills to [C.T.R.] in the past" (id.), "he and [J.R.] had driven to [C.T.R.'s] residence to collect money from an earlier drug deal" (id.), "in the course of their conversation, [C.T.R.] pointed a gun at them and said, 'I ought to blow your damn head off,' and [J.R.] shot [C.T.R.] in self-defense" (id.), "the firearm [seized from the glove box] was [the defendant's] and [] the serial number on the firearm had been scratched off at the time he purchased it" (id. at 5; see also id. at 4-5 n.1 (noting that state prosecutors effectively accepted the defendant's account of C.T.R.'s homicide));

8) the defendant's criminal record included prior convictions for communicating threats, carrying a concealed gun, and resisting a public officer (all on separate occasions) (id. at 6-7);

9) the defendant's drug-debt collection activity and possession of a firearm with an obliterated serial number occurred while he served a probationary sentence (see id. at 7); and

10) the defendant "reported a history of alcohol and marijuana use," but no other illegal drug use (id. at 10; see also id. ("[The defendant] is not interested in participating in any [substance abuse] treatment in the future.")).[1]

Consistent with the foregoing information, the Probation Office observed that "the events that led to the death of [C.T.R.] started with the defendant's criminal conduct of selling a controlled substance. Based on the defendant's criminal history and the offense conduct, it appears the defendant's criminal behavior is on an upward trajectory. It seems the defendant purchased the obliterated firearm to protect his illegal activity of selling controlled substances." (Id. at 15-16.) Despite those aggravating circumstances and the advisory sentencing range providing for imprisonment up to 14 months (see id. at 15), the Probation Office recommended that the Court not impose any prison term, but instead opt for a "three-year probationary sentence with eight months of home detention" (id.), because the defendant "d[id] not have any felony convictions" (id. at 16), he "had some work history . . . and [was] currently working" (id.), he "ha[d] a supportive mother and grandparents" (id.), "he [wa]s responsible for all his children" (id.), and he "ha[d] complied with all conditions of pretrial supervision" (id.).

---

[1] The defendant also reported only alcohol and marijuana use to the Probation Office upon arrest. (See Docket Entry 7 at 3.)

The Court (per Chief Judge Schroeder) sentenced the defendant on February 19, 2019 (see Docket Entry dated Feb. 19, 2019), adopting the PSR "without change" (Docket Entry 17 at 1) and requiring him to serve "probation for a term of four (4) years" (Docket Entry 18 at 2 (emphasis omitted)), on conditions that included "not commit[ting] another federal, state or local crime" (id.), "not unlawfully possess[ing] a controlled substance" (id.), "refrain[ing] from any unlawful use of a controlled substance" (id.), and "abid[ing] by all conditions and terms of the location monitoring home detention program for the first eight (8) months of probation" (id. at 4). That same day, the defendant "tested positive for cocaine and marijuana" (Docket Entry 19 at 1), in violation of his (above-discussed) release conditions (prohibiting new criminal conduct, as well as unlawful drug use and possession), his supposed compliance with which had motivated the Probation Office to recommend probation (see Docket Entry 15 at 15).[2]

During the ensuing (first) ten weeks of probation, the defendant repeatedly violated the (above-discussed) conditions prohibiting new criminal conduct, unlawful drug possession, and unlawful drug use, as evidenced by two more positive tests for both cocaine and marijuana, along with two other positive tests for

_____

[2] "[The defendant] admitted to using marijuana and cocaine the day before his sentencing. [He] was immediately afforded the opportunity for drug treatment but . . . declined treatment services." (Docket Entry 20 at 1.)

marijuana alone. (See Docket Entry 19 at 1; see also Docket Entry 20 at 1 (documenting that the defendant initially "failed to show for his [substance abuse] assessment," later "failed to attend counseling," and remained "unmotivated to take the necessary steps to confront his addiction").) Moreover, "[b]etween the dates of April 15, 2019 to May 14, 2019[, he] had thirteen violations[ of the home detention program] . . . due to [him] misrepresenting his work schedule." (Docket Entry 19 at 2 (emphasis added).)

"The [P]robation [O]ffice addressed these violations by eliminating [the defendant's] leave time and directing him to remain at his residence. Despite the probation officer's efforts, [the defendant] continue[d] to leave his residence without the permission of the probation officer. Between the dates of May 16, 2019 to May 20, 2019[, the defendant] had thirty leave violations." (Id. (emphasis added); see also Docket Entry 20 at 2 ("[The defendant's] employment has been inconsistent and problematic. . . . [His first] employment was terminated in April of 2019 for stealing $50 from the cash register. . . . [A]fter about three weeks [in a new job, the Probation Office] started to notice inconsistencies in [the defendant's] movements and his work schedule. [The Probation Office] contacted [the defendant's] employer and found that [the defendant] had called in sick on April 18, 2019, April 28, 2019, and May 7, 2019, but continued to leave home as if he were working. . . . [The defendant] was suspended

from work between the dates of April 30, 2019 to May 2, 2019 for using a phone on the job.  [He] failed to notify [the Probation Office] of his suspension and again continued to leave each day as if he was working.  Due to [those] continued violations of the location monitoring program[, the Probation Office] restricted [the defendant] to his residence on May 8, 2019.  Since th[at] time, . . . [the defendant] has continued to leave his residence multiple times a day and has failed to respond to [the Probation Office's] repeated attempts to contact him by phone.").)

At a hearing on August 8, 2019, the defendant admitted unlawfully using cocaine and marijuana, as well as failing to comply with the home detention program.  (See Docket Entry dated Aug. 8, 2019.)  As a result, he faced an advisory sentencing range of six to 12 months in prison (see Docket Entry 20 at 2), but the Court (per Chief Judge Schroeder) instead imposed a prison term of only four months, followed by three years of supervised release "under the same terms and conditions as previously imposed," as well as conditions requiring "the [d]efendant [to] reside in a Residential Re-Entry Center (RRC) for the first six (6) months of supervision and [granting] the probation officer [the] authority six (6) months thereafter to consider location monitoring for the [d]efendant" (Docket Entry 31 at 2).

"On August 30, 2019, [the defendant] was released from the custody of the Bureau of Prisons following his revocation sentence.

-7-

The probation officer placed [the defendant] on location monitoring
equipment on September 6, 2019, as there were no [RRC] placements
available . . . ."  (Docket Entry 32 at 2.)  "[The defendant]
committed five violations of the location monitoring program
between September 13, 2019 and November 9, 2019."  (Id.)  In
addition, he "tested positive for cocaine on September 3, 2019 and
October 4, 2019."  (Id.)  Despite those violations, "[b]ased on
[the defendant] having a stable home plan, actively attending
substance abuse counseling, and his parental responsibilities with
his three-year old son, the [Probation Office] recommend[ed]
striking the [RRC] condition . . . and adding [a] condition for
[six months of a] location monitoring curfew program."  (Id.)  The
Court (per Chief Judge Schroeder) accepted that recommendation on
December 2, 2019.  (See Docket Entry 33.)

    The defendant's non-compliance, however, continued unabated:

    On December 13, 2019, [the defendant] failed to abide by
    the terms of the location monitoring program in that he
    deviated from his approved event, failed to acknowledge
    alerts, and allowed his battery to die.  [The defendant]
    initially ignored the on-call officer's phone calls and
    messages.  [The defendant] was authorized to visit his
    mother in Salisbury, NC.  However, [the defendant]
    admitted to being at a peer's residence, where marijuana
    was being used.  [The defendant] tested positive for
    marijuana the following day and disclosed that his
    three-year old son was present.

    On January 31, 2019, [the defendant again] left his
    residence unauthorized . . . .

(Docket Entry 34 at 1; see also Docket Entry 35 at 1 ("[The defendant] has struggled to attend the recommended individual classes to address substance abuse and anger management issues. He was last seen at New Vision Therapy on December 12, 2019. . . . The treatment provider report[ed] that [the defendant] failed to attend scheduled appointments for the month of January 2020.").)

In response, the Probation Office petitioned the Court "[t]o issue a warrant" (Docket Entry 34 at 1) and expressed the view that the defendant's "term of supervision should be revoked" (id. at 3 (checked box omitted)). The Court (per Chief Judge Schroeder), in turn, ordered issuance of an arrest warrant (see Docket Entries 36, 37), which the United States Marshals Service executed on February 12, 2020 (see Docket Entry 42). Thereafter, the Court (per the undersigned Magistrate Judge) (A) held a detention/preliminary hearing pursuant to Federal Rule of Criminal Procedure 32.1(a)(6) and (b)(1), (B) found probable cause to believe the defendant had violated supervised release conditions requiring that he refrain from unlawful possession of a controlled substance and that he comply with a location monitoring program, and (C) concluded the defendant had failed to carry his burden of showing by clear and convincing evidence that he did not pose a risk of nonappearance if released on available conditions, foreclosing release under Federal Rule of Criminal Procedure 32.1(a)(6). (See Docket Entries 43, 44;

<u>see also</u> Docket Entry 35 at 4 (setting out Probation Office's recommendation of detention).)[3]

According to the Probation Office, "[p]ursuant to USSG §7B1.4(a), the [defendant's advisory] range of imprisonment applicable upon revocation is 6 to 12 months." (Docket Entry 35 at 2; <u>see also</u> <u>id.</u> ("[The defendant's] original conviction was a Class D Felony. Therefore, if supervised release is revoked, he may not be required to serve more than 2 years in prison." (citing 18 U.S.C. § 3583(e)(3))).) The Probation Office has recommended a "sentence[ in] the middle of th[at advisory] guideline range . . . ." (<u>Id.</u> at 3.) The Court (per Chief Judge Schroeder) initially set the defendant's final revocation hearing for April 14, 2020 (<u>see</u> Docket Entry 41), but later "rescheduled [it] to May 13, 2020," following the COVID-19-related emergency declarations of the President of the United States and the Governor of North Carolina (Text Order dated Mar. 16, 2020 (emphasis omitted)). The defendant filed the Immediate Release Motion on March 20, 2020 (<u>see</u> Docket Entry 45) and the United States promptly responded in opposition (<u>see</u> Docket Entry 46). Upon inquiry, counsel for the

---

[3] The Probation Office recommended the defendant's detention "until his final revocation hearing as he presents a risk of danger to the community and is considered a risk of flight." (Docket Entry 35 at 4.) Because the defendant did not establish by clear and convincing evidence that he would appear as directed, the Court did not analyze community danger in the above-cited detention order. (<u>See</u> Docket Entry 44.)

defendant informed the Clerk that the defendant would not file a reply. (<u>See</u> Docket Entry dated Mar. 27, 2020.)

DISCUSSION

The Immediate Release Motion asks the Court to grant the defendant, "pursuant to 18 U.S.C. § 3143 and Federal Rules of Criminal Procedure 32.1 and 46[, his] immediate release in light of the increasingly dire COVID-19 coronavirus pandemic." (Docket Entry 45 at 1.) Neither that statutory provision nor those rules allow for the defendant's release based on COVID-19 concerns. As a result, the Immediate Release Motion fails as a matter of law.

In that regard, as to defendants (like the defendant) arrested for violating supervised release conditions, Federal Rule of Criminal Procedure 46 simply states: "[Federal] Rule [of Criminal Procedure] 32.1(a)(6) governs release pending a hearing on a violation of . . . supervised release." Fed. R. Crim. P. 46(d). That cross-referenced subparagraph of Federal Rule of Criminal Procedure 32.1, in turn, provides: "The magistrate judge may release or detain the person [arrested for violating supervised release conditions] under 18 U.S.C. § 3143(a)(1) pending further proceedings. The burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person." Fed. R. Crim. P. 32.1(a)(6). Finally, under the statutory provision incorporated into Federal Rule of Criminal Procedure 32.1(a)(6),

the defendant cannot obtain release "unless the judicial officer finds by clear and convincing evidence that the [defendant] is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ." 18 U.S.C. § 3143(a)(1).

In ordering the defendant's detention just over a month ago, the Court (per the undersigned Magistrate Judge) carefully applied the foregoing standard(s) as quoted here:

> . . . The defendant began his term of supervision on August 30, 2019. Problems began to emerge less than a week later, when, on September 3, 2019, the defendant tested positive for cocaine. The defendant again tested positive for cocaine approximately one month later, on October 4, 2019. The defendant tested positive for marijuana on December 14, 2019.
>
> The defendant began his term of location monitoring on September 6, 2019. One week later, on September 13, 2019, the defendant violated the terms of that program for the first of six times and admitted getting a haircut instead of returning home at the scheduled time. The defendant again violated the terms of the program on October 3, 2019, October 5, 2019, November 9, 2019, and December 13, 2019. On the first of these instances, the defendant used cocaine during the unauthorized absence. On the second of these instances, he falsely claimed authorization for his absence. On the third of these instances, the defendant defied instructions to return to his residence. On the fourth of these instances, the defendant admitted visiting friends while they used marijuana and exposing his three-year-old child to that activity. On December 20, 2019, the defendant attended a pre-revocation meeting with his [probation] officer and a Supervisory United States Probation Officer. Notwithstanding that effort to gain compliance, the defendant violated the terms of his location monitoring program for the sixth time on January 31, 2020.
>
> Such conduct establishes that the defendant's decision-making regarding his substance abuse issues and adherence to the conditions of his location monitoring program has

-12-

not improved since his prior revocation for similar
violations.  Put simply, the defendant's demonstrated
willingness to ignore Court directives precludes a
finding that he will obey a release order requiring him
to appear for Court proceedings.  Accordingly, the
defendant has failed to show by clear and convincing
evidence that he would not pose a risk of nonappearance
if released.

(Docket Entry 44 at 2-3 (internal citation omitted).)

The Immediate Release Motion offers no discernible critique of any aspect of that analysis and cites no authority that would permit (let alone require) the Court to release the defendant in the face of the (unimpeached) finding that he failed to show, by clear and convincing evidence, an absence of risk of nonappearance if released.  (<u>See</u> Docket Entry 45 at 1-13.)  Accordingly, as recently observed by another court faced with a similar motion from a defendant likewise detained pursuant to Paragraph 1 of Subsection 3143(a):  "No judge has reversed the detention order. . . .  [The Court] did not make a finding that [the d]efendant is not likely to flee or pose a danger to any other person or the community. Therefore, under the relevant statute, [the d]efendant shall remain detained."  <u>United States v. Fitzgerald</u>, No. 2:17CR295, 2020 WL 1433932, at *2 (D. Nev. Mar. 24, 2020) (unpublished); <u>see also</u> <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) ("A party should not expect a court to do the work that it elected not to do.").

Alternatively, if the Immediate Release Motion had cited authority and/or had developed argument showing a lawful basis for reconsideration of the defendant's detention, notwithstanding his failure to satisfy Paragraph (1) of Subsection 3143(a), the Court still would deny the Immediate Release Motion as speculative and unreasonable.  To begin, the first of its two argument sections consists of characterizations and/or snippets from media outlets, such as The New York Times, the National Broadcasting Company, National Public Radio, The Outline, The Verge, The Los Angeles Times, the Cable News Network, Reuters, and The Daily Appeal, as well as various government websites, loosely knitted together in an effort to show that "[t]he Guilford County Detention Center's conditions are likely to constitute a genuine humanitarian crisis once the [COVID-19] virus is introduced intramuros[4]" (Docket Entry 45 at 3 (emphasis omitted)).  (See id. at 3-7 & nn.2-19.)

However, with the exception of references to the Guilford County website's data on the average number of detainees in the Greensboro jail and description of its "podular style construction" (id. at 6 & n.17), as well as to a posting on the website of the University of North Carolina's School of Government about the

---

[4] The Latin phrase "*intra muros*" means "within the (city) walls [or] within the (religious) community [or] internal [or] not public."  Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/intra%20muros (last visited Mar. 27, 2020).

suspension of social visits at North Carolina jails (see id. at 7 & n.19), this section of the Immediate Release Motion does not address circumstances at the facility that actually houses the defendant, but instead extrapolates from far-flung situations in the broadest of broad-brush strokes; for example, the defendant declares it a matter of "'when, not if' coronavirus comes to the Guilford County Detention Center" (id. at 4 & n.6 (citing, via footnote, Danielle Ivory, "We Are Not a Hospital": A Prison Braces for the Coronavirus, N.Y. Times, Mar. 17, 2020, available at https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails. html (last visited Mar. 28, 2020), and Rich Schapiro, Coronavirus Could "Wreak Havoc" on U.S. Jails, Experts Warn, NBC News (Mar. 12, 2020), https://www.nbcnews.com/news/us-news/coronavirus-could-wreak -havoc-u-s-jails-experts-warn-n1156586 (last visited Mar. 28, 2020)), based on two stories:

(1) in which a reporter for The New York Times (A) relates concerns about COVID-19 expressed by four identified and three unidentified workers at a Bureau of Prisons facility in Florida, (B) cites positive tests for the COVID-19 virus by one staff member each at a prison in Washington state, a jail in Indiana, and a prison in New York, along with the COVID-19-related death of a prison employee in New York "who had not had contact with inmates for weeks," (C) notes the suspension of visitation at Bureau of Prison facilities, as well as "[m]any state prison systems and

-15-

local jails," (D) references accounts of "more than 500 cases" of COVID-19 in Chinese prisons and of COVID-19-inspired prisoner releases in Iran, (E) mentions demands for the mass release of detainees by "public defender groups in New York City," and (F) attributes claims of lack of preparation "for a coronavirus outbreak, or even a quarantine" to "[m]ore than a dozen [unnamed] employees of the federal prison system, including in New York and Texas," Ivory, <u>We Are Not a Hospital</u>, supra; and

(2) wherein a National Broadcasting Company correspondent (A) discusses the (later-debunked) COVID-19-based fears of staff at a Florida federal prison who saw an inmate wearing a mask, (B) quotes statements by "the former chief medical officer of the New York City jail system" that "'[i]t's just a matter of time before we see cases inside jails'" and that "'[s]ome of the most basic elements of infection control . . . remain out of reach for many people in detention,'" (C) impliedly attributes to unnamed "experts" the view that jails consist of "inmates packed together in often grimy spaces with limited ventilation, [which] provide a prime breeding ground for the spread of infectious diseases," (D) repeats the warning of "a senior staff attorney with the American Civil Liberties Union's National Prison Project" that some jail somewhere "'will be similar to the assisted living facility in Washington state, where no one's going to know [about a COVID-19 outbreak] until it becomes a very serious matter,'" (E) relates

concerns of an official with "the union representing federal prison workers" about COVID-19-fueled "riots," and (F) cites acknowledgments by a Wisconsin sheriff that no vaccine or anti-viral treatment exists for COVID-19 (unlike seasonal influenza) and from a Kentucky "head jailer" that "'like anything else with the jails, there's always the likelihood that [COVID-19 is] going to spread,'" Schapiro, Coronavirus Could "Wreak Havoc", supra.[5]

In the words used by another court in denying a detainee's COVID-19-related release request:

> [The defendant's] arguments [against] being incarcerated
> are general and speculative. [He] argues that he is at
> greater risk of contracting COVID-19 given the lack of
> opportunity for social distancing at [his] facility.
> Unquestionably, avoiding crowds and social distancing are
> recommended to reduce the risk of transmission. But [the
> defendant has not alleged] . . . any known cases of

---

[5] The Immediate Release Motion even goes so far as to imply that news reports of COVID-19 cases in Chinese prisons and of recent efforts by the United States Secretary of State to secure the release of Americans in Iranian prisons support an inference that the Greensboro jail inevitably and immediately will descend into COVID-19-caused chaos. (See Docket Entry 45 at 5-6 & nn.13, 14.) Arguments predicated on the supposed equivalency of jails maintained by duly-elected public officials in Guilford County and prisons operated by totalitarian regimes defeat themselves. See generally Schindler v. Marshfield Clinic, No. 05C705, 2007 WL 60924, at *1 n.1 (W.D. Wis. Jan. 4, 2007) (unpublished) ("Lawyers tempted to draft facts in such hyperbolic terms as these would do well to consider their client's interests before submitting documents that undermine the seriousness of the claims they are litigating and the credibility of the lawyers propounding them."); Thomas C. Berg, Masterpiece Cakeshop: A Romer for Religious Objectors?, 2018 Cato Sup. Ct. Rev. 139, 150 (2017-18) (deducing this principle from recent Supreme Court decision: "Comparing [other situations] with overwhelming evils [i]s hyperbolic – sufficiently so to support an inference of hostility.").

-17-

> COVID-19 at the facility, and instead argues that an
> outbreak is inevitable. This argument is speculative.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *5 (D.

Kan. Mar. 25, 2020) (unpublished) (internal citations omitted); see

also United States v. Williams, Crim. No. 13-544, 2020 WL 1434130,

at *2 (D. Md. Mar. 24, 2020) (unpublished) ("The [Emergency Motion

for Reconsideration of Bond based on COVID-19] goes on to note that

[detainees] are at special risk given their living situation.

These are challenges that cannot be denied, but as they relate to

the issue of release, they are concerns not concrete enough to

justify the release of [the movant]." (internal citation and

quotation marks omitted)); United States v. Jackson, Crim. No. 18-

216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (unpublished)

("[The movant] invites me to speculate that COVID-19 is present or

imminent in the [facility that houses him] . . . justify[ing] the

extreme measure of releasing him to home detention pending

sentence. I do not agree that such a release is warranted by the

facts of this case, or the actual circumstances at the jail.").[6]

---

[6] The first argument section of the Immediate Release Motion
also declares (based on a study conducted in 2011-12) that
"[i]ncarcerated people have poorer health than the general
population" and (without any citation) that "[m]any people who are
incarcerated also have chronic conditions, like diabetes or HIV,
which makes them vulnerable to severe forms of COVID-19." (Docket
Entry 45 at 5 & n.10.) However, the Immediate Release Motion does
not allege (much less show) that the defendant suffers from poor
health or any chronic conditions that would increase his risk of
severe complications if he contracted COVID-19. (See id. at 1-13.)
(continued...)

Further, as the United States has detailed (and the defendant has chosen not to contest via reply):

> [A]dministrators of the [f]acility [housing the defendant] have taken the following comprehensive preventative health and safety measures and maintain certain medically-related capabilities to mitigate risk of outbreak in th[at f]acility:
>
> - Everyone, including officers, medical providers, and new inmates entering the facility are given temperature checks using temperature gun thermometers.[7] Anyone with fever is turned away, except for new arrestees or inmates who must be received. Those persons are immediately quarantined, if presenting with a fever.
>
> - If an inmate must be received who has a fever or is showing other symptoms of COVID-19, they are immediately quarantined in one of seven "negative air rooms." These rooms are equipped with private bathrooms and showers, are designed for single occupancy, and have air filtration systems that ensure that air which is circulated into the rooms is cycled back out of the [f]acility and is not pumped internally through the [f]acility. The negative air rooms also have a dual entrance

---

[6](...continued)
To the contrary, the Immediate Release Motion intimates that the defendant enjoys good health, by articulating his desire to return to a physically demanding job. (See id. at 2, 11; see also Docket Entry 15 at 2 (documenting birth-date making the defendant 25 at present), 10 (reflecting that, just over one year ago, the defendant "stated he does not have any medical problems").)

[7] The above-quoted information regarding employee screening at the Greensboro jail (again which the defendant has elected not to dispute in a reply) runs counter to the unsupported assertion in the first argument section of the Immediate Release Motion that "people who work in [jail] facilities leave and return daily, without screening" (Docket Entry 45 at 4-5), highlighting the problem with the defendant's reliance on sweeping indictments of all jails to demand his release.

system (exterior door, vestibule area, interior door) that allows detention officers to visually check on the inmates and communicate with them, without having to enter the room itself, thus providing extra protection. Medical and nursing staff can and will enter the negative air rooms to provide any needed medical treatment.

- Social visits and volunteer activities are cancelled to limit the possibility of the virus entering the facility.

- Inmate "formal group" activities are suspended.

- Attorneys are still able to meet with inmates by phone and when necessary face-to-face, but face-to-face meetings are held in areas with a glass partition between the inmate and the attorney that allows for communication, while reducing risks of exposure to viruses or other communicable diseases. A small paper pass slot can be used for obtaining signatures or reviewing documents when necessary.

- Signage in the facility is being used to remind inmates, employees, and attorneys to use precautions, to perform basic hygiene, like hand washing, and practice social distancing.

- Sanitary spraying and disinfectant cleaning is conducted daily, twice a day, throughout the [f]acility.

- Inmates are still provided recreation time, in controlled numbers.

- The [f]acility provides "around the clock" medical treatment, which includes a doctor and nurses who are on call during daytime hours (approximately 5-6 people) and during nighttime hours (approximately 3 nurses).

- Detention Officers are cleansing and wiping down restraints before and after use.

- As of March 23, 2020, there have been no confirmed cases of COVID-19 in the Guilford County facilities in Greensboro and High Point. Additionally, no inmates have been brought to the hospital due to symptoms related to COVID-19.

Finally, if a case of COVID-19 were to be confirmed at the [f]acility, the [f]acility has plans to respond to the medical needs of any infected inmate and to minimize exposure risk to the rest of the inmates. In the event that an inmate becomes infected with COVID-19, he or she will be quarantined, monitored, and receive all possible necessary treatments onsite, consistent with Centers for Disease Control and Prevention (CDC) guidelines. If a COVID-19 patient requires medical treatments beyond the capabilities of the [f]acility, the Guilford County Sheriff's Office will arrange transportation and provide security for the infected inmate, so that the patient may receive treatment at an appropriate hospital.

(Docket Entry 46 at 5-8.) Courts have concluded that such showings support denial of COVID-19-based release motions. See, e.g., Clark, 2020 WL 1446895, at *5; Williams, 2020 WL 1434130, at *2-3.[8]

The Immediate Release Motion's second argument section -- entitled "While he does not dispute the violations, [the defendant's] failed drug tests and location monitoring violations do not justify his ongoing detention given the global pandemic" (Docket Entry 45 at 7) -- also fails to persuade the Court to grant relief. Most notably, that section of the Immediate Release Motion

_____

[8] The above-detailed, extensive efforts by Greensboro jail officials to safeguard the health of detainees also belie the defendant's (undeveloped) insinuation that his detention "raise[s] potential constitutional concerns of cruel and unusual punishment" (Docket Entry 45 at 7). See generally Williams, 2020 WL 1434130, at *2 ("On this record, there is no suggestion of mistreatment, dereliction of duty, mismanagement, or other concern.").

relies on at least three false premises, which (when exposed) starkly reveal the unreasonable nature of the defendant's request.

First, the defendant errantly describes his supervised release violations as "relatively low-level infractions" (id. at 8) and "not aggravated" (id. at 10). As the Introduction details, the record establishes quite the opposite, i.e., that, in his brief time on supervised release, the defendant repeatedly engaged in illegal drug activity and habitually flouted location restrictions, just as he did while on probation and release pending his original sentencing. Particularly in light of the fact that (again as shown in the Introduction) the defendant's original conviction arose from his participation in armed, conspiratorial, drug-debt collection that ended in a homicide, the Court cannot dismiss as mere minor matters the defendant's continued involvement in drug activity and blatant defiance of judicially-ordered efforts to control his movements. See generally United States v. Jones, 411 F. App'x 768, 770 (6th Cir. 2010) (affirming imposition of statutory maximum revocation sentence -- twice the high-end of the advisory guideline range -- where supervised releasee left jurisdiction with fellow felons and possessed marijuana residue, leading district court to fear "he was returning to behavior and associations consistent with his underlying criminal conviction" and to conclude, "[i]n light of [his] underlying criminal conviction, the serious nature of his supervised release violations, and his revocation history, . . .

that he was unable or unwilling to conform to the requirements imposed upon him during supervised release"); <u>United States v. Fowler</u>, 222 F. App'x 738, 746 (10th Cir. 2007) ("We agree flagrant evasion of probation supervision was a serious violation of [the appellant's] supervised release, and therefore, we cannot say imposition of the maximum Guidelines sentence was unreasonable.").[9]

Second, the Immediate Release Motion's second argument section states that the defendant "is in custody because he failed to follow location monitoring conditions . . ., but there are no allegations that he did anything illegal or additionally wrong during those violations." (Docket Entry 45 at 8.) In fact, the record confirms that he routinely engaged in illegal or otherwise wrongful conduct while violating location restrictions, including:

1) "[o]n October 3, 2019, [the defendant] left his residence unauthorized . . . [and] <u>us[ed] cocaine</u> during the unauthorized leave" (Docket Entry 34 at 2 (emphasis added));

2) "[o]n October 6, 2019, [the defendant] failed to enter his residence . . . [and] <u>was untruthful with the on-call officer</u> [by]

---

[9] In like fashion, the Probation Office has opined that the defendant's "continued drug use makes him a safety risk to the community" (Docket Entry 35 at 4), as well as that, "[g]iven his past and current conduct, he is unlikely to abide by any release conditions that may be imposed by the Court" (<u>id.</u>).

advis[ing] that he had permission to receive additional leave time" (id. (emphasis added));[10]

3) "[o]n November 9, 2019, [the defendant] failed to enter his residence . . . [and] ignored the on-call officer's instructions to return home" (id. (emphasis added)); and

4) "[o]n December 13, 2019, [while the defendant] failed to abide by the terms of the location monitoring program in that he deviated from his approved event, failed to acknowledge alerts, and allowed his battery to die[, he also] initially ignored the on-call officer's phone calls and messages . . .[, went to] a peer's residence where marijuana was being used[,] . . . tested positive for marijuana the following day and disclosed that his three-year old son was present" (id.).

Third, the Immediate Release Motion's second argument section spends significant space making the implausible contention that, without immediate release, the defendant will serve more time than the Court reasonably could impose as a sanction for his (now-admitted) supervised release violations. (See Docket Entry 45 at 9-12; see also id. at 8 ("[The defendant] does not dispute the accuracy of these violations . . . .").) In so doing, the defendant initially suggested that he should not receive any active

---

[10] Evidence that the defendant lied when confronted about non-compliance also undermines his assertion that he "admitted his violations in real time" (Docket Entry 45 at 11).

revocation sentence, because "alternative programs, such as drug treatment, would be more appropriate." (Id. at 10 (citing 18 U.S.C. §§ 3563(e), 3583); see also id. at 11 ("[The defendant's] substance abuse issues (which he argues are related to his other non-compliance issues . . .), can be readily dealt with, indeed much more effectively dealt with, outside of an incarceration setting.").) That suggestion, however, ignores the overwhelming evidence that, throughout this case (including as recently as his final month on supervised release), the defendant has rejected or has failed to comply with substance abuse treatment. (See Docket Entry 20 at 1 ("[The defendant] admitted to using marijuana and cocaine the day before his sentencing. [He] . . . declined treatment services. [He] again tested positive on March 12, 2019 for cocaine and marijuana. [He] was referred . . . for a substance abuse assessment . . . . [He initially] failed to show for his assessment. On March 24, 2019[, he] reported for an assessment and was recommended to complete 40 hours of out patient substance abuse treatment . . . . [He] failed to attend counseling . . . . [H]e appears to be unmotivated to take the necessary steps to confront his addiction."); Docket Entry 35 at 1 ("[The defendant] has struggled to attend the recommended individual classes to address substance abuse . . . . He was last seen . . . on December 12, 2019. . . . The treatment provider report[ed] that [he] failed to attend scheduled appointments for the month of January 2020.").)

Next in that vein, the defendant has contended that:

> Even upon revocation, the [Sentencing Guidelines] policy statement recommends a sentence of six to twelve months. . . . If he is not released, [the defendant] will have served over three months by the . . . current date for his revocation hearing, May 13, 2020. Should his hearing be postponed any further . . ., which seems entirely possible given the Court's heavy caseload and the number of cases currently delayed or continued[, the defendant] may have served as much or more than the low end of the policy statement range before the Court even hears the matter on final revocation.

(Docket Entry 45 at 10.) This contention lacks merit, because (as the United States well has explained), the defendant "will have the ability to seek an exemption from a future continuance, if such continuance would create the risk of over-serving his projected policy statement range sentence. At this point, the consideration [of this issue] is premature . . . ." (Docket Entry 46 at 2-3; see also Text Order dated Mar. 16, 2020 ("[T]his case is rescheduled to May 13, 2020 . . . . If [the] defendant objects or believes extenuating circumstances exist to require an earlier hearing, [he] may file such a written request." (emphasis omitted)).)[11]

As a final matter, the defendant's proposal that the Court release him from custody because of the risk he may contract COVID-19 and, at the same time, allow him to "continu[e on] supervision"

---

[11] This Court's Standing Order 13 (adopted on March 16, 2020) expressly states that "[e]xceptional cases that may be considered for exemption from a continuance [related to COVID-19] include those where a defendant may be considered to have served or over-served [a] sentence."

(Docket Entry 45 at 11), "residing with his grandparents" (Docket Entry 35 at 1), while resuming "work[] for UPS" (Docket Entry 45 at 11), cannot stand the test of reason, as illustrated in this analysis from another court that confronted an analogous request:

> [The defendant's] proposed release plan addresses only isolated aspects of public health officials' recommendations while ignoring other risk factors that would arise if he were released from custody. . . .
>
> [The defendant] does not address the extent to which his risks could be exacerbated if he returns to [the community]. . . . [H]e offers no evidence to explain how living with his [family members] mitigates the risk of infection. For example, he does not explain who else . . . frequent[s] the home or identify any screening practices or concrete COVID-19 precautions being taken there. He therefore offers nothing more than speculation that [returning to his family members' home and going back to work] would be less risky than living in close quarters with others [in a jail], which at least has screening practices and other reasonable COVID-19 precautions in place. He also does not address the risk of exposure while [out in the community] . . . . And he does not address, . . . [his community] health care system's capacity to provide him with adequate treatment if he were to contract the virus. In contrast, if he remains [in custody,] he has access to around-the-clock medical care, the facility is staffed and trained to contain or treat the virus if necessary . . . . [Government officials] ha[ve] ample motivation to prevent any outbreak at the facility and, even if an outbreak occurs, to contain and manage it for the well-being of all involved.
>
> . . . .
>
> In considering [the defendant's] release . . . based on circumstances related to COVID-19, it is also appropriate to consider the likelihood that the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. A defendant who is unable to comply with conditions of release poses potential risks

to law enforcement officers who are already tasked with
enforcing shelter-in-place orders . . ., [probation]
officers who come into contact with th[at] defendant for
supervision, and others if th[at defendant] is taken back
into custody.

In this case, these considerations do not support
release. . . . Given the [relevant] considerations
discussed previously, the [C]ourt believes [the
defendant] will likely violate any conditions of release
the [C]ourt may impose if the [C]ourt were to issue a
[]release order. . . .

. . . [The defendant] has been unable or unwilling to
remain law-abiding . . . . The [C]ourt has no reason to
believe that he would suddenly become compliant now.

Meanwhile, supervising such a high-risk offender out in
the community will place [probation] officers at
heightened risk of contracting the virus. Location
monitoring is not a limitless resource, nor is its
installation and monitoring by [probation] officers
without risk to those personnel (who must be trained and
certified to install location monitoring) given the
current recommendations regarding implementation of
social distancing. And, when [the defendant] violates
his conditions of release (as he likely will), law
enforcement officers will be forced to expend valuable
resources during a national crisis to take him back into
custody . . ., both increasing the risk to them of
contracting and spreading COVID-19 and further increasing
the risk to the [jail] population when he inevitably
returns to the facility. These additional considerations
weigh in favor of denying the [Immediate Release M]otion.

Clark, 2020 WL 1446895, at *6-7 (internal citations and quotation

marks omitted); see also United States v. Adams, Crim. No. 19-257-

3, 2020 WL 1457916, at *1 (D. Md. Mar. 25, 2020) (unpublished)

("[The] assertion that [electronic] location monitoring will

mitigate danger is both factually incorrect and not easily

available. In light of the advice to practice social distancing,

-28-

the probation office is simply unable to employ devices that require close personal interaction. . . . Beyond that, as troubling as the current COVID-19 situation is, it does not present the kind of extraordinary reason [that requires] release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for the health and safety of those committed to their custody."); <u>Jackson</u>, 2020 WL 1445958, at *2 ("I also must keep in mind the substantial burden that releasing [this defendant] and similarly-situated defendants would place on the U.S. Probation Office at a time when conditions already are not conducive to such monitoring.").

CONCLUSION

In the midst of the Great Recession, (soon-to-be White House Chief of Staff) "Rahm Emanuel stated in November 2008, 'Never let a serious crisis go to waste. What I mean by that is it's an opportunity to do things you couldn't do before.'" Robert P. Mosteller, <u>"Potential Innocence": Making the Most of a Bleak Environment for Public Support of Indigent Defense</u>, 70 Wash. & Lee L. Rev. 1345, 1356 n.30 (2013) (quoting <u>A Forty-Year Wish List</u>, Wall St. J., Jan. 28, 2009, at A14). The Immediate Release Motion puts that mantra into action, by attempting to use the current public health crisis as an opportunity to obtain the defendant's release by substituting conjecture, hyperbole, and misstatement for reasoning based on record facts and applicable law, truly something

"you couldn't do before" COVID-19 (and something no defendant should try to do again during this crisis).

The Court declines to release the defendant, because, "[i]n summary, [he] has still failed to demonstrate by clear and convincing evidence that [his] release is appropriate [under Paragraph (1) of Subsection 3143(a)]. The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card." Williams, 2020 WL 1434130, at *3; see also Fitzgerald, 2020 WL 1433932, at *2 ("[The movant's] argument [for release based on his risk of contracting COVID-19 in detention] applies equally to every detainee in detention; however, the [c]ourt cannot release every detainee at risk of contracting COVID-19 because the [c]ourt would then be obligated to release every detainee. Therefore, the [c]ourt finds [the movant's] COVID-19 argument unpersuasive.").

**IT IS THEREFORE ORDERED** that the Immediate Release Motion (Docket Entry 45) is **DENIED**.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 30, 2020